**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSE CONTRERAS, | : | Civil No. 3:17-CV-02360 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MARK CONRAD, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This is a civil rights case under 42 U.S.C. § 1983 arising from an allegedly unconstitutionally prolonged traffic stop on the shoulder of Interstate 80.  Before the court are cross motions for partial summary judgment.  For the reasons that follow, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted in part and denied in part.

### PROCEDURAL HISTORY

Plaintiff Jose Contreras ("Contreras") initiated this case by filing a complaint on December 21, 2017, against Defendants Mark Conrad ("Conrad"), Nicholas Cortes ("Cortes"), and Jonathan Gerken ("Gerken"), all of whom are officers with the Pennsylvania State Police.  (Doc. 1.)  Defendants answered the complaint on March 9, 2018.  (Doc. 9.)  On May 29, 2018, United States District Judge Malachy E. Mannion granted Contreras's motion to amend his complaint, and Contreras filed an amended complaint on the same day.  (Docs. 18–19.)  In the

amended complaint, Contreras alleges that Defendants violated his First Amendment right to freedom of speech, his Fourth Amendment right to be free from unreasonable searches and seizures, and his Fourteenth Amendment right to equal protection.  (Doc. 19 ¶¶ 46–54.)  The equal protection claim is based on Contreras's assertion that he was treated differently from white individuals because he is Hispanic.  (*Id.* ¶ 51.)  Defendants answered the amended complaint on June 6, 2018.  (Doc. 21.)

Following the close of fact discovery, Contreras filed a motion for summary judgment and a statement of material facts accompanying the motion on September 27, 2019.  (Docs. 37–38.)  Contreras filed a brief in support of his motion for summary judgment on October 9, 2019.  (Doc. 42.)  On January 3, 2020, Defendants filed their own motion for summary judgment, a brief in support of their motion, a statement of material facts to accompany their motion, a brief in opposition to Contreras's motion, and a statement of material facts in response to Contreras's statement.  (Docs. 48–52.)  Contreras filed a reply brief in support of his motion for summary judgment, a brief in opposition to the Defendants' motion for summary judgment, and a statement of facts in response to the Defendants' statement on January 16, 2020.  (Docs. 53–55.)  The court denied Defendants' late motion for extension of time in which to file a reply brief on February 3, 2020.

(Doc. 57.)  Both motions for summary judgment are now ripe for the court's review.

## FACTUAL BACKGROUND[1]

On July 13, 2016, Defendant Cortes stopped Contreras for speeding on Interstate 80.  (Doc. 38 ¶ 2; Doc. 51 ¶ 2; Dashcam footage at 00:00:50.)[2]  After stopping Contreras's vehicle, Cortes approached and began talking to Contreras and his passenger.  (*See* Dashcam footage at 00:01:30.)  Shortly after initiating the stop, Cortes contacted Defendant Gerken and asked him to respond to the scene.  (Doc. 38 ¶ 4; Doc. 51 ¶ 4.)

After the initial conversation with Contreras and the passenger, Defendant Cortes returned to his car to run NCIC and criminal background checks on both individuals.  (Doc. 49 ¶ 16; Do. 54 ¶ 16; Dashcam footage at 00:05:00.)  Because he experienced technical difficulties while doing so, he was not initially able to obtain complete criminal background checks for Contreras or the passenger.  (Doc. 49 ¶ 16; Doc. 54 ¶ 16.)  When he eventually retrieved that information,[3] it revealed

---

[1] This section provides undisputed factual background regarding the traffic stop at issue in this case.  Additional information regarding the traffic stop is discussed below in the court's analysis of whether any genuine issues of material fact preclude the entry of summary judgment.

[2] Dashcam footage of the stop was provided to the court as Plaintiff's exhibit A-1 on October 9, 2019.  (*See* Doc. 41.)  All timestamps are approximate and are provided solely to aid the reader's understanding of the sequence of events.  Timestamps will be cited in the format: [elapsed hours : elapsed minutes : elapsed seconds].

[3] Neither the dashcam footage nor the deposition testimony makes clear when Cortes retrieved this information.

that Contreras had previously been charged with driving under the influence in

Washington state and shoplifting in Illinois and that the passenger had also been

charged with driving under the influence in Washington state.  (Doc. 49 ¶¶ 28–29;

Doc. 54 ¶¶ 28–29.)

Defendant Gerken arrived on the scene about twelve minutes after

Defendant Cortes initiated the stop.  (Dashcam footage at 00:12:15.)  After briefly

speaking with Gerken, Cortes contacted the Pennsylvania Criminal Intelligence

Center ("PACIC") to request a check of Contreras, the passenger, and the vehicle.

(Doc. 49 ¶ 16; Doc. 54 ¶ 16.)  Cortes later testified that he does not call PACIC for

every traffic stop and that the purpose of doing so is to investigate possible

criminal activity.  (Cortes Deposition at 53:16–24.)[4]  According to Cortes, he

called PACIC in this instance because of "[t]he criminal indicators that [he] had

already observed."  (*Id.* at 53:25–54:3.)

While Defendant Cortes was calling PACIC, Contreras waved his hand out

of his window to get the officers' attention.  (Doc. 49 ¶ 18; Doc. 54 ¶ 18; Dashcam

footage at 00:19:00.)  Defendant Gerken approached the vehicle and spoke with

Contreras and the passenger.  (*Id.*)  During this conversation, Contreras told

Gerken that he and his passenger had been on a tourist trip in Illinois and then New

---

[4] The Cortes deposition is docketed at Doc. 49.1.

York City and that they were making their way back to their home state of

Washington by car.  (Doc. 49 ¶¶ 24–26; Doc. 54 ¶¶ 24–26.)  Contreras also stated

that he owned a trucking company called Universal Trucking.  (Doc. 49 ¶ 27; Doc.

54 ¶ 27.)  Gerken observed a Ferrari symbol on one of the suitcases in Contreras's

car and that Contreras was wearing a St. Jude necklace, both of which Gerken

noted were associated with drug trafficking.  (Doc. 49 ¶¶ 34–35; Doc. 54 ¶¶ 34–

35.)  Gerken later testified that Interstate 80, where the stop was taking place, is a

known drug corridor.  (Doc. 49 ¶ 21; Doc. 54 ¶ 21.)  After this conversation,

Gerken returned to Cortes's vehicle and informed Cortes that Contreras wished to

speak to him.  (Doc. 49 ¶ 19; Doc. 54 ¶ 19; Dashcam footage at 00:23:30.)

Defendant Cortes approached Contreras's vehicle and asked Contreras to

step out of the vehicle so that they could talk to each other.  (Doc. 49 ¶ 22; Doc. 54

¶ 22; Dashcam footage at 00:25:00.)  Contreras asked Cortes why it was taking so

long to give him a speeding ticket and stated that a normal traffic stop would only

take ten minutes.  (Doc. 38 ¶ 5; Doc. 51 ¶ 5; Doc. 49 ¶ 22; Doc. 54 ¶ 22.)  Cortes

responded that there was no such thing as a "normal traffic stop," and asked

Contreras "what police academy did you go to?" and "are you a police officer?"

(*Id.*)  During this conversation, Contreras told Cortes that he and his passenger

were on their way back to Washington from New York City, and that they had

been in Illinois before that.  (Dashcam footage at 00:25:00–00:31:00.)  Contreras

also told Cortes that he owned a trucking company called Universal Trucking. (*Id.*)  After Contreras and Cortes finished this conversation and Cortes returned to his vehicle, an analyst from PACIC returned Cortes's call.[5]  (Doc. 49 ¶ 30; Doc. 54 ¶ 30.)

After Contreras had been stopped for approximately one hour and one minute, Defendant Cortes gave Contreras a written warning for speeding.  (Doc. 38 ¶ 6; Doc. 51 ¶ 6; Dashcam footage at 01:01:00.)  Cortes then asked Contreras if he would consent to a search of his vehicle.  (Doc. 38 ¶¶ 8–9; Doc. 51 ¶¶ 8–9; Dashcam footage at 01:03:00.)  Contreras refused to consent to a search.  (Doc. 38 ¶ 8; Doc. 51 ¶ 8; Dashcam footage at 01:03:00.)  As a result, Cortes informed Contreras that he was going to call a K-9 unit to the scene, returned to his vehicle, and called for the K-9 unit.  (Dashcam footage at 01:03:00–01:05:00.)

Defendant Cortes returned to where Contreras was standing after calling for a K-9 unit, at which point Contreras asked if he was being detained, which led to the following exchange between him and Cortes:

> Plaintiff: "So, can I go or am I being detained?  That's what I don't understand."
>
> Cortes: "You are being detained."

---

[5] Because the microphone is turned off at multiple points during the stop, it is not entirely clear from the dashcam footage when PACIC returned Cortes's call, but the video evidence shows that Cortes received a phone call approximately twenty minutes after he first called PACIC and then a second call about ten minutes later.  (*See* Dashcam footage at 00:36:05, 00:46:30.)

Plaintiff: "Why am I being detained for?  Why am I being detained?"

Cortes: "Look, I can tell from talking to you that no matter what the answer is that I give you, you're going to disagree with me.  So we'll agree to disagree.  But right now, I want to search that vehicle, and if you don't want to let me, fine, you have the right to refuse.  So what I'm telling you now is you're being detained."

Plaintiff: "I'm being detained."

Cortes: "Yes."

Plaintiff: "Is it being recorded too?"

Cortes: "As I told you before, that camera right there has been rolling from the very beginning."

Plaintiff: "But I'm being detained.  What crime have I committed?"

Cortes: "That is not what I'm getting into because no matter what, it's going to cause a disagreement between you and I, so I won't speak to you any further about that.  I don't have to and I'm not going to because I'm not going to argue with you.  I'm not going to give you a hard time."

Plaintiff: "I asked you why I'm being detained."

Cortes: "Okay, because I want to search that vehicle.  And that's it."

(Doc. 21 ¶ 14; Doc. 38 ¶ 10; Doc. 51 ¶ 10; Dashcam footage at 01:06:55.)

After Contreras had been given a written warning and after Cortes had told Contreras that he was being detained, Defendant Conrad, an officer in the K-9 unit, responded to the scene with a police dog named Astor.  (Doc. 38 ¶¶ 13–16; Doc. 51 ¶¶ 13–16; Dashcam footage at 01:19:00.)  Cortes requested that Conrad have Astor perform a sniff test of Contreras's vehicle.  (Doc. 38 ¶ 16; Doc. 51 ¶ 16.)

Astor performed the sniff test, at which point Conrad stated that Astor had alerted on the passenger door of the car.  (Doc. 38 ¶ 18; Doc. 51 ¶ 18.)

Following the K-9 sniff test of the vehicle, all three Defendants searched Contreras's vehicle.  (Doc. 38 ¶ 19; Doc. 51 ¶ 19.)  Contreras had not consented to this search, and the Defendants did not have a search warrant.  (*Id.*)  The search lasted for approximately an hour and twenty minutes, and included a search of two suitcases that were in the car.  (Doc. 38 ¶¶ 19–20; Doc. 51 ¶¶ 19–20.)  The Defendants did not find any drugs, contraband, or anything illegal in the car.  (Doc. 38 ¶ 21; Doc. 51 ¶ 21.)  The search did reveal an inoperable after-market compartment, but the compartment did not contain any drugs, contraband, or any other illegal items.  (Doc. 38 ¶ 22; Doc. 51 ¶ 22.)  The search also revealed a number of tools, *see* Doc. 49 ¶ 52; Doc. 54 ¶ 52, including glue, a metal bar, a tube of J-B Weld, a drill, and a saw.  (Cortes Deposition at 35:9–36:2.)

Following the on-scene search of Contreras's car, and after Contreras had been stopped for approximately two hours and forty minutes, the Defendants ordered a tow truck to take Contreras's car to a mechanic.  (Doc. 38 ¶ 27; Doc. 51 ¶ 27.)  The Defendants conducted further searches on Contreras's car once it had arrived at the mechanic's garage, including a search by Defendant Gerken using a tool called a "borescope" and a K-9 search of the interior of the vehicle.  (Doc. 38 ¶¶ 39–40; Doc. 51 ¶¶ 39–40.)  Defendants then had a mechanic remove parts of the

car to continue the search.  (Doc. 38 ¶ 42; Doc. 51 ¶ 42.)  Through all of these searches, Defendants did not find any drugs or contraband in the car.  (Doc. 38 ¶ 43; Doc. 51 ¶ 43.)  Defendants did not obtain a warrant at any point before conducting any of the searches of Contreras's car.  (Doc. 38 ¶ 44; Doc. 51 ¶ 44.)

The entire incident from when Contreras was first pulled over to the conclusion of the search at the mechanic's garage lasted approximately five hours. (Doc. 49 ¶ 59; Doc. 54 ¶ 59.)  During the stop, Cortes ordered Contreras and his passenger to leave their cellphones in the car when they left the vehicle, despite knowing that they had a constitutional right to film police conduct. (Doc. 38 ¶¶ 25–26; Doc. 51 ¶¶ 25–26.)

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is

not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or

denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Contreras's Fourth Amendment and First Amendment claims are brought under 42 U.S.C. § 1983, which allows a plaintiff to bring a civil claim for the deprivation of his constitutional rights.  Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

In his motion for summary judgment, Contreras argues he is entitled to judgment as a matter of law on his Fourth Amendment claim under *Rodriguez v. United States*, 575 U.S. 348, 354 (2015),[6] because Defendants unconstitutionally extended the traffic stop beyond the time that was reasonably necessary to complete the mission of the traffic stop.  (Doc. 42 at 5–10.)  Defendants argue in response that the extension of the traffic stop was constitutional because they had a reasonable suspicion that Contreras and his passenger were involved in criminal activity.  (Doc. 52 at 2–6.)  Defendants additionally argue that they are entitled to qualified immunity as to Contreras's Fourth Amendment and First Amendment claims.  (*Id.* at 6–8.)  Contreras replies that Defendants' actions were not supported by a reasonable suspicion of criminal activity and that Defendants are not entitled to qualified immunity because they violated his clearly established constitutional rights.  (Doc. 53 at 20–25.)

---

[6] Although *Rodriguez* was a criminal case involving the suppression of evidence, such cases may be used in a case in which a plaintiff seeks civil liability under 42 U.S.C. § 1983 because both contexts involve interpretation of constitutional rights guaranteed by the Fourth Amendment of the United States Constitution.  *See, e.g.*, *Black v. Montgomery County*, 835 F.3d 358, 364–65 (3d Cir. 2016) (applying criminal suppression cases in civil context).

Defendants affirmatively move for summary judgment, raising the same arguments that they raise in opposition to Contreras's motion for summary judgment.  (*See* Doc. 50.)  Contreras raises the same arguments in response that he uses to support his own motion for summary judgment.  (Doc. 55 at 7–27.)  Neither party moves for summary judgment as to Contreras's equal protection claim.  (*See generally* Docs. 42, 50.)

In reviewing the parties' cross motions for summary judgment, the court will first review the arguments related to Contreras's Fourth Amendment claim before turning to the arguments related to Contreras's First Amendment claim.  The court concludes that Defendants extended the traffic stop beyond the time that was reasonably necessary to complete the mission of the stop, but finds that genuine issues of material fact preclude the entry of summary judgment on Contreras's Fourth Amendment claim. The court further concludes that Defendants are entitled to qualified immunity as to the First Amendment claim.  Accordingly, the court will deny both parties' motions as to the Fourth Amendment claim but grant Defendants' motion as to the First Amendment claim.

### A. Defendants Extended the Traffic Stop Beyond the Time that Was Reasonably Necessary to Complete the Mission of the Stop

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  A traffic stop is a seizure under the Fourth Amendment and is therefore unconstitutional when it

becomes unreasonable.  *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018)

(citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)).  As a type of *Terry*

stop,[7] a traffic stop may be initiated based on a reasonable suspicion that a traffic

violation has occurred.  *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018).

Because the "mission" of a traffic stop is to address the traffic violation that

initiated the stop and attend to related safety concerns, the traffic stop may last no

longer than the time necessary to complete the mission.  *Rodriguez*, 575 U.S. at

354.  "Authority for the seizure thus ends when tasks tied to the traffic infraction

are—or reasonably should have been—completed."  *Id.*  Therefore, although a

police officer conducting a traffic stop may perform investigative tasks that are

unrelated to the mission of the traffic stop, he "may not do so in a way that

prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify

detaining an individual."  *Id.* at 355.

Reasonable suspicion is something more than a hunch but something less

than probable cause.  *Green*, 897 F.3d at 183.  Although reasonable suspicion

requires only "a particularized and objective basis" for suspecting criminal activity,

it "should not be derived from characteristics common to the 'vast majority of

innocent' individuals."  *Id.* (first citing *Ornelas v. United States*, 517 U.S. 690, 696

---

[7] Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may conduct a brief stop of an individual based on a reasonable suspicion that the individual is committing a crime or about to commit a crime.

(1996), then quoting *Karnes v. Skrutski*, 62 F.3d 485, 494 (3d Cir. 1995)).

Whether an officer had reasonable suspicion is analyzed based on the totality of the

circumstances confronting the officer at the time of the incident and cannot be

reduced to a set of per se rules.  *Id.*  The question of whether officers have a

reasonable suspicion is "a mixed question of law and fact": the court must

determine whether the events leading up to the search or seizure amount to a

reasonable suspicion when viewed from the perspective of a reasonable police

officer.  *Ornelas*, 517 U.S. at 696–97 (citing *Pullman-Standard v. Swint*, 456 U.S.

273, 289 n.19 (1982)).

In completing the mission of a traffic stop, a police officer may pursue

"ordinary inquiries incident to the traffic stop," which typically include "checking

the driver's license, determining whether there are outstanding warrants against the

driver, and inspecting the automobile's registration and proof of insurance."

*Rodriguez*, 575 U.S. at 355 (citing *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).

An officer may also take "certain negligibly burdensome precautions in order to

complete his mission safely."  *Id.* at 356.  "On-scene investigation into other

crimes, however, detours from that mission.  So too do safety precautions taken in

order to facilitate such detours."  *Id.*

Although the Supreme Court in *Rodriguez* made clear that a traffic stop may

not be extended beyond the time that is reasonably necessary to complete the

mission of the traffic stop, *Id.* at 354, the point at which a traffic stop is extended—in other words, "the *Rodriguez* moment"—is sometimes difficult to discern. *Green*, 897 F.3d at 179–80.  Determining when the *Rodriguez* moment occurred, however, is crucial to the analysis under *Rodriguez* and its progeny, because any information that the police discover after the *Rodriguez* moment cannot inform a court's analysis of whether the police had a reasonable suspicion that a crime was being committed.  *Id.* at 181–82.  The court therefore must determine when the *Rodriguez* moment occurred and determine whether the police officers had "reasonable suspicion in order to justify the extension" at that time.  *Id.* at 179.

Turning to the facts of this case, the court finds that Defendants extended the traffic stop beyond the time that was reasonably necessary to complete the mission of the traffic stop when Defendant Cortes contacted PACIC.[8]  Although police officers may conduct background checks as an ordinary aspect of a traffic stop, they may not do so for purposes unrelated to the mission of the traffic stop.  *Id.* at 355–56.  Here, by his own admission, Cortes contacted PACIC to investigate possible criminal activity based on the "criminal indicators" that he had observed prior to contacting PACIC.  (Cortes Deposition at 53:19–54:3.)  The

---

[8] As noted above, *see supra* Note 5, although it is difficult to determine precisely how long the stop was extended by Cortes contacting PACIC, the video evidence shows that the stop was delayed at least to some extent by Cortes calling PACIC and subsequently waiting for the results from PACIC.  (*See* Dashcam footage at 00:12:00–01:01:00.)

reasonableness of a seizure "depends on what the police in fact do," *Rodriguez*, 575 U.S. at 357, and, as Cortes's testimony makes clear, what the police were doing in contacting PACIC was investigating criminal activity that was unrelated to the traffic stop.  (*See* Cortes Deposition at 53:19–54:3.)  Accordingly, because the *Rodriguez* moment occurred when Defendant Cortes contacted PACIC, the Defendants' reasonable suspicion must be based on events that occurred before that action.  *Green*, 897 F.3d at 181–82.

### B. Genuine Issues of Material Fact Preclude the Entry of Summary Judgment on Contreras's Fourth Amendment Claim

Because the court concludes that Defendants extended the traffic stop beyond the time that was reasonably necessary to complete the mission of the traffic stop, the court turns its attention to whether Defendants had a reasonable suspicion that a crime was being committed at the time they extended the stop.

Defendants point to several factors to establish that they had a reasonable suspicion to justify extending the stop, including (1) Contreras confronting Defendant Cortes with "attitude" during their initial conversation; (2) Contreras texting someone during that conversation; (3) the passenger being nervous; (4) the passenger answering questions about the vehicle; (5) the fact that Contreras was driving on Interstate 80, a known drug corridor; (6) the fact that Contreras had a Commercial driver's license ("CDL"), but behaved in a way that was unusual for someone with a CDL; (7) the fact that Contreras and his passenger had been in

Illinois and then made an unplanned trip to New York City; (8) the fact that a piece

of luggage in the car had a Ferrari symbol, which Defendants assert is associated

with the Sinoloa drug cartel; (9) the fact that Contreras was wearing a St. Jude

necklace, which, according to Defendants, is associated with drug trafficking; and

(10) the information that Cortes learned during his call with PACIC.  (Doc. 50 at

6–8; *see also* Doc. 52 at 3–5.)

Although Defendants point to ten factors that purportedly gave them a

reasonable suspicion of criminal activity, the last four of those factors cannot be

considered as part of the reasonable suspicion analysis because they were not

known at the time of the *Rodriguez* moment.  *See Green*, 897 F.3d at 181–82

(noting that nothing that occurs after the *Rodriguez* moment can be considered as

part of the reasonable suspicion analysis).  The court briefly addresses each of

those four factors.

The fact that Contreras and his passenger had been in Illinois and then New

York was not known to Defendant Cortes when he called PACIC.  Although both

Cortes and Defendant Gerken independently learned this information from

Contreras, neither one of them knew it at the time Cortes called PACIC: Gerken

learned the information while speaking with Contreras during the period of time

when Cortes was first on the phone with PACIC, while Contreras did not learn the

information until he spoke with Contreras outside of his vehicle. (*See* Dashcam footage at 00:18:30–00:20:00, 00:27:00–00:30:45.)

Similarly, neither the fact that a piece of luggage in Contreras's vehicle had a Ferrari symbol nor the fact that Contreras wore a St. Jude necklace were known to Defendant Cortes at the time he called PACIC. Both facts were related to Cortes by Gerken, who observed them during conversation with Contreras and the passenger while Cortes was first calling PACIC. (*See id.* at 00:18:30–00:20:00; Doc. 49 ¶¶ 34–35; Doc. 54 ¶¶ 34–35.)

Finally, and most obviously, information that Defendant Cortes learned during his call with PACIC was not known to Cortes at the time he called PACIC, so it cannot form the basis of a reasonable suspicion. (*See* Dashcam footage at 00:16:52.) Therefore, information about Contreras and his passenger's travel itinerary, the fact that a piece of luggage had a Ferrari symbol, the fact that Contreras wore a St. Jude necklace, and the information that Cortes learned during the call with PACIC cannot inform the reasonable suspicion analysis. *See Green*, 897 F.3d at 181–82.

Instead, the reasonable suspicion analysis must be based on the facts that were known to Defendant Cortes at the time he called PACIC. As noted above, these facts purportedly included Contreras's attitude in speaking with Cortes; Contreras texting someone while talking to Cortes; the passenger being nervous

and answering questions about the vehicle; Contreras driving on Interstate 80, which was a known drug corridor; and Contreras behaving in a way that was unusual for someone with a CDL.

The court concludes that genuine issues of material fact preclude the entry of summary judgment as to the issue of whether Defendants had a reasonable suspicion of criminal activity at the time they extended the traffic stop. Although it is undisputed that Contreras was driving on Interstate 80, which is a known drug corridor, this fact alone is not sufficient to establish reasonable suspicion, and there are genuine issues of material fact as to every other fact that purportedly supported Cortes's call to PACIC.

Defendants allege that Contreras confronted Cortes with attitude during their initial conversation. (Doc. 49 ¶ 5.) Contreras disputes this contention and cites to the dashcam footage, which he asserts shows that he did not have any attitude when speaking with Cortes. (Doc. Doc. 54 ¶ 5.) Because it is not clear from the dashcam footage how Contreras answered Cortes's questions or his demeanor while doing so, this factor presents a genuine issue of material fact for trial. Similarly, the parties dispute whether Contreras was texting during the initial conversation with Cortes, and the dashcam footage does not definitively resolve this dispute. (Doc. 49 ¶ 6; Doc. 54 ¶ 6.) Contreras also disputes Defendants' contentions that his passenger appeared nervous and that he was answering

questions for Contreras.  (Doc. 49 ¶¶ 8–11; Doc. 54 ¶¶ 8–11.)  Although the

dashcam footage clearly shows the passenger answering Cortes's questions, *see*

Dashcam Footage at 00:12:15, factual disputes regarding the passenger's demeanor

cannot be resolved at the summary judgment stage and present genuine issues of

material fact for trial.  Finally, although it is undisputed that Contreras has a CDL,

Contreras disputes Defendants' contention that his behavior was abnormal for an

individual with a CDL.  (Doc. 49 ¶ 23; Doc. 54 ¶ 23.)  Thus, this factor, like the

other factors based on the demeanor of Contreras and his passenger, presents a

genuine issue of material fact that cannot be resolved at his stage of litigation.

Accordingly, the court concludes that genuine issues of material fact preclude the

entry of summary judgment with regard to Contreras's Fourth Amendment claim.

### C. Genuine Issues of Material Fact Preclude a Finding of Qualified Immunity as to Contreras's Fourth Amendment Claim

Having determined that summary judgment is precluded on the merits of

Contreras's Fourth Amendment claim, the court turns to Defendants' argument that

they are entitled to qualified immunity.  (*See* Doc. 50 at 10–13; Doc. 52 at 6–8.)

The doctrine of qualified immunity recognizes that despite their participation

in constitutionally impermissible conduct, government officials "may nevertheless

be shielded from liability for civil damages if their actions did not violate 'clearly

established statutory or constitutional rights of which a reasonable person would

have known.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).

Defendants asserting that they are entitled to qualified immunity have the burden to prove that the doctrine applies.  *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).  Courts follow a two-pronged test to determine whether qualified immunity applies.  *Pearson*, 555 U.S. at 232.  First, the court must determine whether the defendants violated the plaintiff's statutory or constitutional right. *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Second, the court must determine whether the right at issue was clearly established at the time of the violation.  *Id.* (citing *Reichle*, 566 U.S. at 664).  The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.

A right is clearly established if "every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015).  To be clearly established, there does not have to be a

case that is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)).

In determining whether a right is clearly established, courts must not define the right "at a high level of generality." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742.) Rather, the analysis should focus on "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742.) It is especially important to be specific in the context of Fourth Amendment rights, because it is sometimes difficult for police to determine whether Fourth Amendment rights apply in particular factual situations. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The court finds that there are genuine issues of material fact that preclude the entry of summary judgment as to Defendants' qualified immunity argument. Although the right to be free from police officers extending a traffic stop beyond the time that is reasonably necessary to complete the mission of the stop without reasonable suspicion of a crime was clearly established at the time Contreras was stopped, *Rodriguez*, 575 U.S. at 350, there are genuine issues of material fact as to whether Defendants violated that right. As explained above, genuine issues of material fact as to the behavior and demeanor of Contreras and his passenger prevent this court from determining whether Defendants had a reasonable

suspicion of criminal activity.  Accordingly, the court will deny Defendants'

motion for summary judgment on the issue of qualified immunity.

### D. Defendants Are Entitled to Qualified Immunity as to Contreras's First Amendment Claim

The court turns next to Plaintiff's First Amendment claim.  Contreras's First

Amendment claim is based on allegations that Defendant Cortes confiscated his

and his passenger's phones during the traffic stop so that they could not record the

officers' actions.  (Doc. 19 ¶¶ 30–33.)  Contreras alleges that the confiscation of

his phone violated his First Amendment right to record the police.  (*Id.* ¶ 50.)

Defendants argue they are entitled to qualified immunity as to this claim.  (Doc. 50

at 13.)  Contreras argues that Defendants are not entitled to qualified immunity

because the Third Circuit held in *Fields v. City of Philadelphia*, 862 F.3d 353 (3d

Cir. 2017) that individuals have a First Amendment right to record police officers

conducting their official duties while in public.  (Doc. 55 at 26.)

In reviewing Defendants' argument that they are entitled to qualified

immunity on Plaintiff's First Amendment claim, the court will first analyze

whether the right at issue was clearly established at the time of the incident.  *See

Pearson*, 555 U.S. at 236 (holding that courts may exercise discretion in deciding

which qualified immunity element to analyze first).

Contreras is correct that the First Amendment protects an individual's right

to record police officers conducting their official duties in public.  *See Fields*, 862

F.3d at 356.  That right, however, was not clearly established at the time

Defendants stopped him.  Prior to the Third Circuit's decision in *Fields*, the Third

Circuit had never held that individuals had a First Amendment right to record the

police.  *Id.* at 357.  To the contrary, the Third Circuit held on multiple occasions

that defendants were entitled to qualified immunity because the First Amendment

right to record the police was not clearly established at the time of their actions.

*See True Blue Auctions v. Foster*, 528 F. App'x 190, 193 (3d Cir. 2013); *Kelly v.*

*Borough of Carlisle*, 622 F. 3d 248, 262 (3d Cir. 2010).  The Third Circuit reached

the same conclusion in *Fields*, holding that the First Amendment protects an

individual's right to record the police, but that the officers in that case were

nonetheless entitled to qualified immunity because the right was not clearly

established at the time of their actions.  *Fields*, 622 F.3d at 360–62.

Third Circuit case law therefore indicates that a First Amendment right to

record the police was not clearly established prior to the court's decision in *Fields*

establishing such a right.  The *Fields* decision was issued on July 7, 2017,

approximately one year after the events at issue in this case.  The court accordingly

concludes that the right to record police officers conducting their official duties in

public was not clearly established at the time of Contreras's traffic stop.  The court

will grant the Defendants' motion for summary judgment as to the Plaintiff's First

Amendment claim on that basis.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted in part and denied in part. None of the parties are granted summary judgment as to Plaintiff's equal protection claim because no party has moved for such relief. (*See generally* Docs. 42, 50.) Accordingly, trial in this matter shall proceed as to Plaintiff's equal protection and Fourth Amendment claims. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: May 6, 2020